UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| VORTEXA INC.,<br><br>                          Plaintiff,<br><br>                  -against-<br><br>   JOSEPH CACIOPPO,<br><br>                          Defendant. | Case No. 1:24-cv-02065 (JLR)<br><br>**OPINION AND ORDER** |

JENNIFER L. ROCHON, United States District Judge:

Vortexa Inc. ("Vortexa") seeks a preliminary injunction enjoining its former

employee, Joseph Cacioppo, from working for Kpler, Inc. ("Kpler") for the one-year duration

of his noncompete agreement.  Cacioppo opposes the motion and separately moves to dismiss

the complaint and compel arbitration.  For the following reasons, both motions are DENIED.

## BACKGROUND

### I.   Vortexa and Kpler

Vortexa sells "real-time data and advanced analytics for energy and freight markets."

ECF No. 13 ("Kuhn Decl.") ¶ 6.  It offers three core software products: (1) energy flows

showing the real-time movement of energy across the world; (2) freight analytics showing the

cost of transporting energy; and (3) inventories showing how much oil is stored in tanks on

land.  *Id.*

Vortexa's "chief competitor" is Kpler, *id.* ¶ 8, a "data and analytics company" that

offers "commodities tracking, maritime tracking, and energy tracking," ECF No. 31

("Friedman Decl.") ¶¶ 4-5; *see* ECF No. 28-3 ("Cacioppo Arb. Cl.") ¶ 29 (Cacioppo's demand

for arbitration describing Kpler as a company that tracks and analyzes "the production,

movement, refinement, and inventories for 40 distinct commodities, . . . the movement and

activities of vessels[, and] . . . the movements and activities in over-the-road trucking and rail transportation").

Cacioppo has worked in the energy-services industry for over 20 years.  ECF No. 30 ("Cacioppo Decl.") ¶ 3.  Before Vortexa, he worked as an energy broker.  *Id.* ¶ 8; *see* ECF No. 14-1.  On January 26, 2024, while employed by Vortexa, Cacioppo accepted a job at Kpler as its Director of Market Engagement for the Americas.  Cacioppo Decl. ¶¶ 38-39, 43.

## II.  Cacioppo's Work at Vortexa

Cacioppo joined Vortexa in September 2022 as the company's first Sales Director, based in New York City.  *Id.* ¶ 23.  At Vortexa, Cacioppo was responsible for, among other things, "identifying and developing relationships with . . . prospects and customers, serving as the first point of contact for incoming sales leads, generating qualified sales opportunities, . . . researching target accounts, . . . identifying key players, generating interest, and developing target accounts and account plans."  ECF No. 14 ("Kedros Decl.") ¶ 9; *see* ECF No. 14-2 at 2 (job description); ECF No. 29 ("PI Opp.") at 2 (Cacioppo's "primary job at Vortexa" was "to find new clients, educate them about Vortexa's products, and close deals").

The parties dispute the nature of the training that Cacioppo received from Vortexa. Cacioppo's manager at Vortexa, Cosmo Kedros, testifies that Cacioppo participated in the "Vortexa Academy" training program and received informal training from other employees, who had Cacioppo shadow their meetings with prospective clients, participate in onboarding calls with product specialists, and review recorded meetings.  Kedros Decl. ¶¶ 12-13.  Kedros also testifies that Vortexa gave Cacioppo a "large set of sales leads" and hired two full-time product specialists in New York to help Cacioppo, and that Vortexa hosted several events in New York "specifically for the purpose of helping Cacioppo" meet customers and prospects. *Id.* ¶¶ 14-15.  Cacioppo denies receiving any sales leads and claims that his formal training

consisted only of Vortexa Academy, an "energy industry 101 course" with information that he already knew from his "20+ years as an energy broker." Cacioppo Decl. ¶ 25. He also claims that he received "minimal informal training," such as tutorials on how to use Salesforce. *Id.* ¶ 26.

Vortexa claims that Cacioppo was privy to, and helped develop, sensitive information about Vortexa's business, products, and customers. According to Vortexa, Cacioppo was "steeped in" confidential information that included:

> (1) competitive positioning against competitors (like Kpler),
> (2) customer pricing, contract terms, customer and prospect feedback on Vortexa's products, and other essential non-public details about Vortexa's customer base, (3) Vortexa's global strategic plans and sales pipelines, (4) Vortexa's deal structure and sales engagement processes and strategies, and
> (5) Vortexa's global CRM containing real-time data on Vortexa's complete sales opportunities at different stages, a forward-looking view of Vortexa's sales pipeline, and information on all lost sales opportunities (including the competitor to which the opportunity was lost and the reason the opportunity was lost).

ECF No. 12 ("PI Br.") at 10; *accord* ECF No. 33-1 ("Arb. Countercl.") ¶ 15; *see* PI Br. at 3-4 (also describing the types of confidential information to which Cacioppo allegedly had access).

Beyond this general overview, Vortexa cites specific examples of confidential information accessed by Cacioppo during his employment. On January 8, 2024, Cacioppo viewed a PowerPoint presentation known internally as the "Battle Card," which contains "a detailed breakdown of the differentiators and advantages of Vortexa's product over that of competitors." ECF No. 16 ("Hawkins Decl.") ¶ 9. On the Battle Card, which is marked on the front page as "STRICTLY INTERNAL ONLY," are "direct comparison points" between Vortexa and its competitors (including Kpler), and "talking points against any perceived

3

weaknesses in Vortexa's offerings." *Id.* ¶¶ 9-13.  "In quick succession with opening the Battle Card," Cacioppo also viewed a file known as the "Brochure," which contains "in-depth information" on Vortexa's products and discusses Vortexa's "major customer targets in the industry." *Id.* ¶ 16.

Cacioppo also communicated as recently as October 13, 2023, on Vortexa's "Competitive Intelligence" Slack channel, through which Vortexa employees share impressions of and feedback from their clients.  ECF No. 34 ("Kedros Reply Decl.") ¶ 8.  He joined Vortexa's weekly Global Sales calls, where the sales team discussed its ongoing deals and sales tactics.  *Id.* ¶ 10; *see* ECF No. 37 ¶ 11.  In July 2023, Cacioppo received a "confidential strategy and growth plan of Vortexa's [Application Programming Interface ('API')] product portfolio for 2023 and 2024."  ECF No. 35 ("Langerak Reply Decl.") ¶ 8.  On January 5, 2024, Cacioppo opened a document called "API Use Cases," which contains "unique selling points of Vortexa's API and how it is communicated to customers and prospects."  ECF No. 36 ("Manji Reply Decl.") ¶ 9.  In November 2023, he also opened two confidential documents, one with "detail[s] on the user experience of Vortexa's [API] product alongside the methodology Vortexa uses to generate unique data and insights," and another with "unique selling points of Vortexa's [Software Development Kit]." *Id.* ¶¶ 10-11.

Cacioppo responds that Vortexa's sales team was "very disorganized."  Cacioppo Decl. ¶ 28.  He denies that Vortexa had "targeted marketing materials."  *Id.*  According to him, the Global Sales calls consisted of "high level discussions" where the sales staff talked "in generalities about their leads and deals." *Id.* ¶ 29.  Cacioppo does not remember viewing the Battle Card and states that Vortexa gave the Brochure to customers and prospects without requiring a nondisclosure agreement. *Id.* ¶ 27.

### III.  The Agreement

In connection with accepting Vortexa's offer of employment, Cacioppo signed an At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement.  ECF No. 28-5 ¶ 4; *see* ECF No. 28-6 (the "Agreement").  Included in the Agreement is a noncompete covenant (the "Noncompete") under which Cacioppo agreed that, for 12 months following the end of his employment with Vortexa, he would not work for "any business whose business, products or operations are in any respect involved in the Covered Business."  Agreement § 8(A).  The Noncompete defines "Covered Business" as "any business in which [Vortexa] is engaged, or any service that [Vortexa] provides."  *Id.*  The Noncompete applies to Cacioppo's activities in the "Territory," defined as:

> (i) all counties in the State of New York; (ii) all other states of the United States of America in which [Vortexa] provided goods or services, had customers, or otherwise conducted business at any time during the two-year period prior to the date of the termination of [Cacioppo's] relationship with [Vortexa]; and (iii) any other countries from which [Vortexa] maintains non-trivial operations or facilities, provided goods or services, had customers, or otherwise conducted business at any time during the two-year period prior to the date of the termination of [Cacioppo's] relationship with [Vortexa].

*Id.*  The Noncompete also provides that, "[i]n the event that the [Noncompete is] deemed to exceed the time, geographic or scope limitations permitted by applicable law, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, then permitted by such law."  *Id.* § 8(D).

The Noncompete contains other provisions relevant here.  It provides that, "[s]hould [Cacioppo] obtain other employment . . . within twelve (12) months immediately following the termination of [his] relationship with [Vortexa]," he will "provide written notification to [Vortexa] as to the name and address of [his] new employer, the position that [he] expect[s] to

hold, and a general description of [his] duties and responsibilities, at least three (3) business days prior to starting such employment." *Id.* § 8(A).  It also contains an acknowledgement that the obligations in the Noncompete are "necessary to protect Company Confidential Information and, consequently, to preserve the value and goodwill of [Vortexa]." *Id.* § 8(C).

Elsewhere in the Agreement is an arbitration clause that designates arbitration as "the sole, exclusive, and final remedy for any dispute between [Cacioppo] and [Vortexa]." *Id.* § 12(C) (capitalization omitted).  The Agreement also states that, "during and after [Cacioppo's] employment with [Vortexa], [he] will hold in the strictest confidence and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information," including "any and all non-public information that relates to the actual or anticipated business and/or products, research or development of [Vortexa]." *Id.* § 2(A)-(B).

### IV.  Cacioppo's Transition from Vortexa to Kpler

On January 26, 2024, Cacioppo informed Kedros that he was resigning, effective immediately.  Kedros Decl. ¶ 25; *see* ECF No. 30-3.  In discussing his resignation, Cacioppo said that he had two offers of employment from other companies.  Kedros Decl. ¶ 26. Cacioppo also said that he would no longer work in sales, including in a later text message to Kedros stating that his "next role will not be selling, it will be a shift back to markets and relationships." *Id.* ¶ 28; *see id.* ¶ 26.  From these statements, Kedros believed that Cacioppo "was not going to a competitor and was instead leaving the [energy-analytics] industry to return to his former profession as a securities broker in the financial services industry." *Id.* ¶¶ 26, 28.  Following his resignation, Cacioppo had a 26-minute phone call with Kedros and another colleague to pass off his accounts.  Cacioppo Decl. ¶ 40.  He returned his work laptop to Vortexa shortly thereafter. *Id.* ¶ 42.

On February 5, 2024, Cacioppo began working for Kpler as its Director of Market Engagement for the Americas.  *Id.* ¶ 43.  In his new role, Cacioppo works with Kpler's existing clients – namely, 28 of Kpler's 50 largest clients – to "increase their engagement with Kpler and, if possible, their spending with Kpler."  *Id.* ¶ 44.  With these clients, who were not clients or prospects at Vortexa while Cacioppo was at Vortexa, Cacioppo "discuss[es] the markets and how the data Kpler sources, through its own proprietary process, gives trading institutions an advantage in the market."  *Id.*

In late February 2024, Vortexa learned that Cacioppo may have started working at Kpler.  ECF No. 15 ¶ 23; *see* ECF No. 1 (the "Complaint" or "Compl.") ¶ 26 (Vortexa "only learned that Cacioppo was possibly working for Kpler approximately a month after Cacioppo's resignation when it heard third-hand about his possible competitive employment").  Vortexa reviewed Cacioppo's digital activity and found that he viewed the Battle Card and Brochure on January 8, 2024, 18 days before his resignation.  Hawkins Decl. ¶ 9.

On March 15, 2024, Cacioppo's counsel confirmed that Cacioppo was working at Kpler.  PI Br. at 5.

**V.   The Instant Action and Arbitration Proceedings**

On March 19, 2024, Vortexa brought the instant action against Cacioppo.  Compl.  On March 29, 2024, Vortexa moved for a preliminary injunction to enjoin Cacioppo from working for Kpler for the one-year duration of his Noncompete.  PI Br.; *see* PI Opp.; ECF No. 32 ("PI Reply").[1]  That day, Cacioppo filed a demand for arbitration with JAMS seeking

---

[1] Vortexa also sought expedited discovery as to Cacioppo's communications with and work for Kpler, but conditioned its request on the Court finding that "Vortexa has not yet put forth enough evidence to support its request for a preliminary injunction."  PI Reply at 25; *see* PI Br. at 15-16.

damages for unpaid wages and fraudulent inducement, as well as a declaration that the restrictive covenants in the Agreement, including the Noncompete, are unenforceable.  *See* Cacioppo Arb. Cl. at 1; Agreement § 12(B) (agreeing that any arbitration will be administered by JAMS).  On April 10, 2024, Cacioppo moved to dismiss the Complaint or, alternatively, to compel arbitration and stay this action pending such arbitration.  ECF No. 25; *see* ECF Nos. 28-1 ("MTD Br."), 42 ("MTD Reply").[2]  Vortexa filed a counterclaim with the parties' arbitrator on April 16, 2024.  *See* Arb. Countercl.

## DISCUSSION

Before the Court are two motions: Vortexa's motion for a preliminary injunction, and Cacioppo's motion to dismiss the case and compel arbitration.  The Court first considers Cacioppo's motion to dismiss.

### I.  Cacioppo's Motion to Dismiss and Compel Arbitration

Cacioppo moves to dismiss the Complaint and compel arbitration, arguing that the Agreement covers Vortexa's breach-of-contract claim brought before this Court.  MTD Br. at 6.  Vortexa does not dispute that a valid arbitration agreement exists between the parties; indeed, it notes that each party has filed claims against the other with their agreed-upon arbitrator.  PI Reply at 2; *see* Cacioppo Arb. Cl.; Arb. Countercl.  At issue, however, is whether the Court has jurisdiction to consider Vortexa's preliminary-injunction motion and, if so, whether such relief is appropriate given the parties' pending arbitration.

---

[2] Vortexa attached six declarations to its reply in support of its preliminary-injunction motion. ECF Nos. 34-39.  Cacioppo moved to strike this "new" evidence and associated arguments and, alternatively, sought leave to file a sur-reply in the form of a ten-page enlargement to his pending response.  ECF No. 40.  The Court denied Cacioppo's request to strike but granted him leave to file the additional ten pages to address the materials and argument.  ECF No. 41.

"Where the parties have agreed to arbitrate a dispute, a district court has jurisdiction to issue a preliminary injunction to preserve the status quo pending arbitration." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 894-95 (2d Cir. 2015); *see Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 238 (2d Cir. 2016) ("Generally, courts should consider the merits of a requested preliminary injunction even where the validity of the underlying claims will be determined in arbitration." (quotation marks and citation omitted)).  The Second Circuit has reversed district courts "where they have adopted the erroneous view that the 'decision to refer the dispute to arbitration strips the court of power to grant injunctive relief.'"  *Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*, No. 20-cv-00181 (KMK), 2020 WL 915824, at *3 (S.D.N.Y. Feb. 26, 2020) (brackets omitted) (quoting *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of N.Y., Inc.*, 749 F.2d 124, 125 (2d Cir. 1984) (per curiam); and citing *Am. Express Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998)).

The logic behind this settled Circuit precedent is clear: "[P]ro-arbitration policies reflected in . . . Supreme Court decisions are furthered, not weakened, by a rule permitting a district court to preserve the meaningfulness of the arbitration through a preliminary injunction."  *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1053 (2d Cir. 1990).  "Arbitration can become a hollow formality if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute."  *Id.* (quotation marks and citation omitted).

Here, the Court "retain[s] the power, and the responsibility, to consider" Vortexa's application for a preliminary injunction "while [the] dispute [with Cacioppo] is being arbitrated."  *Gen. Mills*, 2020 WL 915824, at *3.  Vortexa seeks to enforce a covenant that bars Cacioppo from working for Kpler for 12 months.  Were the Court to decline to consider Vortexa's preliminary-injunction motion pending arbitration, much of the damage that

Vortexa "seeks to prevent w[ould] occur in the time it takes for the arbitrator to be appointed, consider the issues, and deliver a final ruling." *Id.* "Such a delay would indeed render arbitration a 'hollow formality.'" *Id.* (quoting *Blumenthal*, 910 F.2d at 1053).

Cacioppo argues that "Vortexa's proposed remedy would upend the status quo" because it would "give Vortexa substantially all the relief it seeks on a fraction of the information it must present" in arbitration to obtain such relief. MTD Br. at 10-11 (emphasis omitted). The Court disagrees for two reasons. First, "for purposes of granting a preliminary injunction, the 'status quo' is not simply the status quo in the moment before relief is granted," *Gen. Mills*, 2020 WL 915824, at *8, but rather "the last actual, peaceable uncontested status which preceded the pending controversy," *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (citation omitted). The present controversy began when Cacioppo started working for Kpler. Granting a preliminary injunction would return the parties to the proper status quo – that is, the period prior to Cacioppo's employment by Kpler – until their arbitration concludes. Second, Cacioppo misstates the relief available to Vortexa under its preliminary-injunction motion. In the arbitration, Vortexa seeks damages for Cacioppo's alleged breaches of the Agreement as well as an injunction barring him from: "(a) working at Kpler for twelve months after the termination of his employment with Vortexa, extended to include any period of time in which Cacioppo has already been employed by Kpler in violation of the Noncompete; and (b) using or disclosing any" confidential information. Arb. Countercl. at 10. Securing a preliminary injunction here would not provide Vortexa with this specific relief or a decision on the merits; rather, a preliminary injunction would "merely . . . preserve the relative positions of the

parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).[3]

Cacioppo also argues that Vortexa's failure to file an arbitration demand precludes injunctive relief.  *See* MTD Br. at 9-10.  Yet Vortexa filed its counterclaim in arbitration shortly after Cacioppo filed his original motion to dismiss.  *See* Arb. Countercl.  To the extent that this issue is not moot, Vortexa's timing in filing an arbitration demand – after moving in this Court for a preliminary injunction – does not amount to an "end-run" around the Agreement.  MTD Br. at 10; *see Gen. Mills*, 2020 WL 915824, at *1 (granting the plaintiff's application for a preliminary injunction where the plaintiff initially brought the action in federal court despite a valid and applicable arbitration agreement).

Finally, Cacioppo argues that injunctive relief is inappropriate because Vortexa seeks only damages in its complaint for Cacioppo's alleged breach of contract.  *See* MTD Br. at 8.  The Court does not agree.  Vortexa, in its complaint, seeks "other and further relief as the Court deems just and proper."  Compl. at 7.  Vortexa's counterclaim in arbitration also includes a request for injunctive relief.  *See* Arb. Countercl. at 9.  Therefore, Vortexa may seek a preliminary injunction in aid of arbitration and its claims filed in that forum.  *See Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 86 (2d Cir. 2004) ("[A] court can grant any relief to which a prevailing party is entitled, whether or not that relief was expressly sought in

---

[3] Cacioppo's argument that Vortexa changed the status quo – by waiting seven weeks to file the Complaint after learning of Cacioppo's employment at Kpler – misstates the timeline of events.  *See* MTD Reply at 3.  Vortexa filed the Complaint on March 19, 2024, roughly seven weeks after Cacioppo resigned on January 26, 2024.  Yet Cacioppo never told Vortexa that he was leaving for Kpler.  *See generally* Cacioppo Decl.; *see* Kedros Decl. ¶ 30.  Vortexa did not receive confirmation of Cacioppo's new role until March 15, 2024.  *See* PI Br. at 5.  Cacioppo points to no earlier time when Vortexa would have been on notice of his new role, and Cacioppo did not update his LinkedIn profile or appear on Kpler's website.  Kedros Decl. ¶ 31.

the complaint."); *cf. Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 66 (1978)

("[A]lthough the prayer for relief may be looked to for illumination when there is doubt as to

the substantive theory under which a plaintiff is proceeding, its omissions are not in and of

themselves a barrier to redress of a meritorious claim.").

Cacioppo provides no support for the proposition that failing to expressly request

injunctive relief in its complaint precludes Vortexa from obtaining an injunction.  At most,

Cacioppo cites to *Jiangxi Zhengao Recycled Textile Industry Co. v. Amazon.com Services,*

*LLC*, No. 23-cv-09692 (JGLC), 2023 WL 8700956, at *3 (S.D.N.Y. Dec. 15, 2023), where the

court held that a request for injunctive relief to stay an underlying arbitration presented issues

"entirely different" from those alleged in the complaint, *see* MTD Br. at 8.  Here, however,

Vortexa's motion for a preliminary injunction arises from its allegations that Cacioppo

breached the Noncompete by working for Kpler and failing to inform Vortexa of his new

employment.  While it may have been prudent for Vortexa to amend its complaint to ensure

overlap between the relief sought through its motion and the specific relief requested in its

pleading, the omission, without more, does not bar the Court from considering its preliminary-

injunction motion.

Therefore, the Court denies Cacioppo's motion and holds that Vortexa's motion for a

preliminary injunction is properly before the Court.

## II.   Vortexa's Motion for a Preliminary Injunction[4]

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *JTH*

*Tax, LLC v. Agnant*, 62 F.4th 658, 666-67 (2d Cir. 2023) (quoting *Winter v. Nat. Res. Def.*

---

[4] During an initial hearing before this Court, the parties agreed to litigate Vortexa's
preliminary-injunction motion on the papers, without oral argument or an evidentiary hearing.
*See* PI Opp. at 2 n.1; PI Reply at 24-25; MTD Reply at 2 (noting the parties' stipulation that
Vortexa's preliminary-injunction motion "will be decided on the papers without a full

*Council, Inc.*, 555 U.S. 7, 24 (2008)).  "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Id.* at 667 (quoting *Winter*, 555 U.S. at 20); *see Benihana*, 784 F.3d at 895 ("The standard for such an injunction [to preserve the status quo pending arbitration] is the same as for preliminary injunctions generally.").

Cacioppo argues that Vortexa must meet a heightened legal standard by showing a clear or substantial likelihood of success on the merits.  *See* MTD Reply at 6.  This heightened standard applies where the plaintiff "seeks an injunction that provides [it] substantially all the relief [it] seeks in the litigation, and that cannot be meaningfully undone in the event that the enjoined party prevails at trial on the merits."  *JTH Tax*, 62 F.4th at 667.  As discussed above, Vortexa's requested injunction would preserve the status quo and enjoin Cacioppo only until arbitration is complete.  Injunctive relief would not provide Vortexa with any of the damages that it seeks through arbitration.  Moreover, "courts in this Circuit routinely apply the ordinary standard rather than the heightened, mandatory injunction standard when deciding whether to issue an injunction in connection with an employment contract."  *Int'l Bus. Machs. Corp. v. De Freitas Lima*, No. 20-cv-04573 (PMH), 2020 WL 5261336, at *6 (S.D.N.Y. Sept. 3, 2020) (brackets omitted) (quoting *Gen. Mills*, 2020 WL 915824, at *8), *aff'd*, 833 F. App'x 911 (2d Cir. 2021) (summary order); *see Accenture LLP v. Trautman*, No. 21-cv-02409 (LJL), 2021 WL 6619331, at *8 (S.D.N.Y. June 8, 2021) ("Where, as here, a court considers whether to

---

evidentiary hearing or oral argument").  In deciding this motion, the Court therefore relies on the parties' pleadings and accompanying declarations submitted in support of or in opposition to the motion.  *See Camenisch*, 451 U.S. at 395 ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.").

enjoin an employee from continuing to perform services that a past employer alleges violates

a restrictive covenant, the Court need not apply the heightened standard applicable to

mandatory injunctions, as opposed to status quo injunctions." (brackets, quotation marks, and

citation omitted)); *see also N. Am. Soccer League*, 883 F.3d at 36 ("Prohibitory injunctions

maintain the status quo pending resolution of the case; mandatory injunctions alter it.").

Therefore, the Court applies the ordinary standard for a preliminary injunction.

"A showing of irreparable harm is 'the single most important prerequisite for the

issuance of a preliminary injunction.'" *JTH Tax*, 62 F.4th at 672 (quoting *Faiveley Transp.

Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). "[A]n irreparable injury is

'an injury that is not remote or speculative but actual and imminent, and for which a monetary

award cannot be adequate compensation.'" *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d

Cir. 2011) (further quotation marks omitted) (quoting *Tom Doherty Assocs. v. Saban Ent.,

Inc.*, 60 F.3d 27, 37 (2d Cir. 1995)). A plaintiff need only show a "threat of irreparable harm,

not that irreparable harm already [has] occurred." *Mullins v. City of New York*, 626 F.3d 47,

55 (2d Cir. 2010) (emphasis omitted). But a "mere possibility" of irreparable harm does not

"justify the drastic remedy of a preliminary injunction." *Borey v. Nat'l Union Fire Ins. Co. of

Pittsburgh*, 934 F.2d 30, 34 (2d Cir. 1991).

The Second Circuit has rejected the proposition that "irreparable harm must inevitably

be assumed in breach of covenant cases." *JTH Tax*, 62 F.4th at 673 (quoting *Baker's Aid, Inc.

v. Hussman Foodservice Co.*, 830 F.2d 13, 15 (2d Cir. 1987) (per curiam)). "Though courts

often issue preliminary injunctions when it appears likely that the plaintiff will prevail in

covenant-not-to-compete cases, this is not an automatic process, but instead depends upon the

factual particulars in each case." *Baker's Aid*, 830 F.2d at 15; *accord Trautman*, 2021 WL

6619331, at *8; *Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 236 (S.D.N.Y. 2014).

Here, Vortexa presents two theories of irreparable harm: first, Cacioppo's position at Kpler poses the risk that he will inevitably disclose confidential information that he learned at Vortexa; and, second, Cacioppo's new role at Kpler threatens Vortexa's goodwill with its clients. *See* PI Br. at 9-14; PI Reply at 12-19. The Court addresses each theory in turn.

### A. Confidential Information

> 1. *There Is No Risk of Irreparable Harm from the Inevitable Disclosure of Trade Secrets*

"A court may find a risk of irreparable harm where it is likely that a trade secret has been misappropriated or will be misused or where, based on the defendant's position, disclosure of a trade secret is inevitable." *Trautman*, 2021 WL 6619331, at *9; *accord Int'l Bus. Machs. Corp. v. Visentin*, No. 11-cv-00399 (LAP), 2011 WL 672025, at *16 (S.D.N.Y. Feb. 16, 2011) *aff'd*, 437 F. App'x 53 (2d Cir. 2011) (summary order); *Int'l Bus. Machs. Corp. v. Papermaster*, No. 08-cv-09078 (KMK), 2008 WL 4974508, at *7 (S.D.N.Y. Nov. 21, 2008); *see also De Freitas Lima*, 2020 WL 5261336, at *14 ("Courts have found irreparable harm where there is a likely risk that a former employer's trade secrets will inevitably be disclosed.").

Vortexa does not argue that Cacioppo has misappropriated any confidential information or that he intends to do so. Rather, it invokes irreparable harm based on the risk that Cacioppo will inevitably disclose that confidential information. Put another way, Vortexa suggests that Cacioppo "would be unable to avoid using [Vortexa's confidential] information if he were to do his job for [Kpler]." *Am. Airlines, Inc. v. Imhof*, 620 F. Supp. 2d 574, 581 (S.D.N.Y. 2009). Importantly, however, Vortexa does not assert that any of its information,

detailed above, amounts to a trade secret to which the inevitable-disclosure doctrine applies. Its complaint makes no mention of trade secrets and does not allege trade-secret misappropriation. *See generally* Compl. Nor do its briefs refer to the information as trade secrets. *See generally* PI Br.; PI Reply. Nevertheless, the Court will consider first the sensitivity of the information to which Cacioppo was privy at Vortexa and, second, the risk that such information will be disclosed or used by Cacioppo in his new position.[5]

New York courts define a "trade secret" as "any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." *Faiveley*, 559 F.3d at 117 (citation omitted); *accord E.J. Brooks Co. v. Cambridge Sec. Seals*, 105 N.E.3d 301, 310 (N.Y. 2018). Courts consider the following factors when determining whether certain information constitutes a trade secret:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which

---

[5] To the Court's knowledge, no court in this District has expressly excluded confidential information not rising to the level of a trade secret from the scope of the inevitable-disclosure doctrine. However, several courts to have considered the risk of inevitable disclosure either did not apply the doctrine to such information or did so only where the plaintiff had identified at least one plausible trade secret at risk of disclosure. *See, e.g.*, *Trautman*, 2021 WL 6619331, at *14-17 (applying the inevitable-disclosure doctrine to the claimed trade secrets before considering whether, beyond that, there was a risk of irreparable harm from disclosing confidential information); *W. Publ'g Corp. v. Coiteux*, No. 16-cv-06825 (JSR), 2017 WL 4339486, at *3-4 (S.D.N.Y. Aug. 28, 2017); *Visentin*, 2011 WL 672025, at *16 (applying inevitable-disclosure standard where plaintiff had demonstrated "a few exceptions" of information constituting trade secrets); *Estee Lauder*, 430 F. Supp. 3d at 174-77. *But see De Freitas Lima*, 2020 WL 5261336, at *7 (applying the inevitable-disclosure doctrine, on the parties' request, to confidential information despite noting that the non-compete at issue "protects a broader range of [confidential] information than the common law New York doctrine of 'trade secrets' might protect").

> the information could be properly acquired or duplicated by
> others.

*Faiveley*, 559 F.3d at 117 (citation omitted); *accord Ashland Mgmt. Inc. v. Janien*, 624 N.E.2d

1007, 1013 (N.Y. 1993).

Of the specific examples of confidential information identified by Vortexa, few, if any,

amount to a protectable trade secret.  Vortexa first points to its Battle Card, a PowerPoint

presentation that Cacioppo arguably viewed before resigning.  The slide deck "outlines

Vortexa's positioning against its key competitors," and "contains specific information about

key reasons for choosing Vortexa over its competitors and how to counter Vortexa's

perceived weaknesses across each of its products."  PI Br. at 12.  This information speaks to

competitive differences that, from the record, are obvious and would not be particularly

difficult for Kpler to ascertain on its own.  *See Trautman*, 2021 WL 6619331, at *11 (webcast

discussing the "strength and weaknesses of [the plaintiff's] competitors" was too high-level to

amount to a trade secret); *id.* at *12 (same for document marked "confidential" that "provides

a competitive analysis" of its competitor).  The record reflects that "Kpler has a larger

business and more clients than Vortexa."  ECF No. 38 ("Kuhn Reply Decl.") ¶ 9.  In addition,

except for energy tracking, the companies generally sell different products.  *Compare* Kuhn

Decl. ¶ 6 (describing Vortexa's "core product offerings" as "energy flows" tracking the real-

time movement of energy, "freight analytics" on the transportation of energy, and

"inventories" on the amount of oil in tank storage), *with* Friedman Decl. ¶¶ 4-5 (identifying

Kpler's core tracking products as "commodities tracking" for 40 different commodities,

"maritime tracking" on vessel movements, and "energy tracking" on power and emissions;

noting other non-tracking products such as data and market-analysis reports); *see* Kuhn Reply

Decl. ¶ 20 (acknowledging that Kpler sells certain products not offered by Vortexa).  Even in

the area where the two companies compete – commodities tracking – the differences in their products are clear.  The Court credits the unrefuted testimony of David Friedman, Cacioppo's manager at Kpler, that, according to "publicly available information," Vortexa focuses "on the tech-side of cargo tracking and relies on algorithms and artificial intelligence" while Kpler "invests in human intelligence and hard data."  Friedman Decl. ¶ 13; *see* PI Opp. at 22 ("Kpler sources all of its data from sources it owns").  Indeed, Kpler claims to have its own "battle cards" outlining its competitive differences with Vortexa, and points to an article documenting Vortexa's previous issues with data quality.  ECF No. 43 ("Friedman Reply Decl.") ¶ 15.  In short, the Battle Card does not appear to contain information that would be especially valuable to Kpler, or that a large degree of effort or money was expended by Vortexa to develop, or that could not be easily acquired or duplicated by Kpler or others.  *See Papermaster*, 2008 WL 4974508, at *7.

Vortexa also asserts that Cacioppo had access to its Brochure, which "contains in-depth information on all of Vortexa's products and offerings, including where its data comes from, what data is included, and how the data works with customers' platforms."  Hawkins Decl. ¶ 16.  Yet Vortexa provides this document to prospective clients without requiring a confidentiality agreement.  *See id.* ("[T]he Brochure is most typically used in the introduction of new prospects and clients."); Cacioppo Decl. ¶ 27 ("Vortexa offers [the Brochure] without requiring [customers and prospective customers] to sign a non-disclosure or confidentiality agreement").  Therefore, the Brochure cannot amount to confidential information, much less a trade secret.

Vortexa relies on other instances of confidential information referenced for the first time in declarations attached to its reply brief.  The Court shares Cacioppo's concern that, were this information as sensitive as Vortexa claims, it would have been included in Vortexa's

opening brief.  *See* MTD Reply at 9.  Vortexa's first two examples note that Cacioppo
communicated on Vortexa's "Competitive Intelligence" Slack channel and participated in
weekly Global Sales calls.  Kedros Reply Decl. ¶¶ 8, 10.  On the Slack channel, Vortexa
employees shared "insights gleaned about preferences from clients or complaints from clients,
that can then be used in future relationships with those existing clients or in securing new
contracts."  *Id.* ¶ 8.  During the sales calls, the sales team discussed how to approach ongoing
deals.  *See id.* ¶ 10.  Without more, the information circulated in these settings seems akin to
best practices and general sales strategies.  The context in which this information was shared,
on a company-wide Slack or in team-wide conference calls, also does not suggest that any of
these "insights" were tightly guarded within Vortexa.  *See EarthWeb, Inc. v. Schlack*, 71 F.
Supp. 2d 299, 315 (S.D.N.Y. 1999) ("[I]t is well established that an employee's recollection
of information pertaining to specific needs and business habits of particular customers is not
confidential." (quotation marks and citation omitted)), *aff'd*, 2000 WL 1093320 (2d Cir. 2000)
(summary order) ("*EarthWeb II*").  There is no evidence on the record as to security protocols
to protect that information.  *Cf. De Freitas Lima*, 2020 WL 5261336, at *8 ("The information
[at issue] is shared only with small groups of IBM's top executives responsible for overseeing
IBM's strategies, may not be copied, and is subject to security protocols."); *Papermaster*,
2008 WL 4974508, at *8 (defendant was "exposed to other sensitive and confidential
information . . . , all of which is information that is disclosed to a select few within the
company").

Vortexa also argues that Cacioppo received a "confidential strategy and growth plan"
of its API product portfolio.  Langerak Reply Decl. ¶ 8.  Yet the document, sent to Cacioppo
by a Product Marketing Lead, *id.* ¶ 3, appears to be a marketing document that describes
Vortexa's products at a high level of abstraction, *id.* ¶ 8 (the document "outlines all of our

tactics needed to take this product to market"). "Such marketing strategies, however, are not necessarily protected as 'trade secrets' under New York law." *Visentin*, 2011 WL 672025, at *14 (quotation marks omitted); *cf. EarthWeb*, 71 F. Supp. 2d at 314 ("In some contexts, courts have found that particularized marketing plans, costing and price information may constitute trade secrets."). While Cacioppo recalls this document, he does not remember it containing more sensitive information on Vortexa's growth plans or anything beyond its marketing strategy as to Vortexa's API offering. ECF No. 44 ("Cacioppo Reply Decl.") ¶ 17. To the extent that the document contains information on "Vortexa's methodology and AI/ML models," Langerak Reply Decl. ¶ 8, Kpler has already incorporated its own artificial-intelligence and machine-learning models into its own software, Friedman Reply Decl. ¶ 13. Therefore, Vortexa has not demonstrated from this document the existence of a trade secret in need of protection.

Finally, Vortexa points to three files called "API Use Cases," "API Vortexa Glossary," and "Financial Services SDK Use Cases." PI Reply at 5-6, 12. Vortexa claims only that its "google drive log records" show that Cacioppo opened and viewed these documents, which underlines the lack of security protecting this purportedly confidential information. Manji Reply Decl. ¶¶ 9-11. In any event, Vortexa does not explain how the "unique selling points" in these documents are confidential when those same points are "communicated to customers and prospects." *Id.* ¶¶ 9, 11. Indeed, Vortexa's own website provides selling points for several use cases. *See* Friedman Reply Decl. ¶ 10 (linking to selling points for physical trading, freight analytics, market insights, and energy-derivative trading). To the extent that they are not public or known in the industry, data sets and the methodology behind Vortexa's products might well constitute trade secrets. *See In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) ("[C]onfidential proprietary data relating to pricing, costs, systems, and methods are

protected by trade secret law.").  Yet the Court credits both Cacioppo's testimony that he lacks the technical ability to understand or explain how Vortexa's API offering worked, Cacioppo Reply Decl. ¶ 17; *cf. EarthWeb*, 71 F. Supp. 2d at 316 ("Obviously, [the defendant] need not have been a programmer to have been exposed to technology constituting a trade secret, but it does not appear that his editorial responsibilities placed him in the requisite proximity."), and Friedman's testimony that Kpler has no need for Vortexa's API because its own offering relies on vastly different sources of data, Friedman Reply Decl. ¶ 12.

Absent these specific documents, Vortexa cites general buckets of confidential information to which Cacioppo had access: Vortexa's "competitive positioning," "non-public details about Vortexa's customer base," "global strategic plans and sales pipelines," "deal structure," and "global CRM."  PI Br. at 10; *see id.* at 3-4.  However, Vortexa provides few additional details as to what the purportedly confidential information entailed.  Without more details, "these conclusory assertions of the kinds of information [Cacioppo] was exposed to do not suffice to show that [he] possessed trade secrets" that would be useful to Kpler.  *W. Publ'g Corp. v. Coiteux*, No. 16-cv-06825 (JSR), 2017 WL 4339486, at *4 (S.D.N.Y. Aug. 28, 2017).  Pricing data and market strategies do not, alone, amount to trade secrets.  *See id.*; *Visentin*, 2011 WL 672025, at *14 ("[M]arketing strategies . . . are not necessarily protected as 'trade secrets' under New York law." (quotation marks omitted)).  "[M]ere knowledge of the intricacies of a business is simply not enough to constitute a trade secret."  *Coiteux*, 2017 WL 4339486, at *4 (quotation marks and citation omitted).  To the extent that a given category of information might constitute a trade secret, Vortexa has not offered any details by which the Court could conclude that it would prove useful to a competitor.  Overall, then, Vortexa has "failed to provide specific examples of confidential or trade secret information that could

actually be used to [its] detriment if [Cacioppo] were allowed to [continue in his] new position at [Kpler]." *Visentin*, 2011 WL 672025, at *10.

Even assuming that Cacioppo was exposed to trade secrets, Vortexa has not shown that the disclosure of such trade secrets is inevitable in his current role. "[T]he inevitable disclosure doctrine treads an exceedingly narrow path through judicially disfavored territory." *EarthWeb*, 71 F. Supp. 2d at 310. "The doctrine of inevitable disclosure operates, in limited circumstances, as a substitute for evidence of actual disclosure where the nature of the new employment 'creates a risk that disclosure of this information is inevitable.'" *Metito (Overseas) Ltd. v. Gen. Elec. Co.*, No. 05-cv-09478 (GEL), 2009 WL 399221, at *11 (S.D.N.Y. Feb. 18, 2009) (quoting *Papermaster*, 2008 WL 4974508, at *7). When determining whether the disclosure of trade secrets (or, as here, confidential information) is inevitable, courts evaluate certain factors, including:

> (1) the extent to which the new employer is a direct competitor of the former employer; (2) whether the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer; (3) the extent to which the trade secrets at issue would be valuable to the new employer; and (4) the nature of the industry and its trade secrets.

*Papermaster*, 2008 WL 4974508, at *7 (quoting *Payment All. Int'l v. Ferreira*, 530 F. Supp. 2d 477, 482 (S.D.N.Y. 2007)); *see Visentin*, 2011 WL 672025, at *16-20 (applying inevitable-disclosure test to confidential information).

The first factor weighs in favor of a finding of inevitable disclosure. Kpler and Vortexa are direct competitors. The companies are in the same industry. *Compare* Kuhn Decl. ¶ 6 ("Vortexa provides market-leading real-time data and advanced analytics for energy and freight markets."), *with* Friedman Decl. ¶ 10 (describing Kpler as a "leader in the data

analytics market for global commodities tracking"). They target the same customers. *Compare* Kuhn Decl. ¶ 13 ("multi-national energy companies, national oil companies, commodities traders, ship owners, financial services organizations, and governments"), *with* Friedman Decl. ¶ 7 ("Kpler's clients include national oil companies, international oil companies, trading houses, governmental institutions, hedge fund, investment funds, independent refiners, and shipping companies."); *see* Friedman Decl. ¶ 14 (acknowledging "cases where a client would use both Kpler and Vortexa's products"); Kuhn Reply Decl. ¶¶ 10-12 (listing three instances where Vortexa and Kpler competed directly for the same customer). And, at least with respect to energy tracking, the companies sell overlapping products. *See* Kuhn Reply Decl. ¶ 6 (noting that "Vortexa offers energy tracking" and explaining that "energy is the largest commodity, representing more than half of all commodities in terms of revenue and where the two companies compete head on"). Kpler also concedes that the companies overlap in the cargo-tracking space, which "represents roughly half of Kpler's business." Friedman Decl. ¶ 13. At least as to cargo-tracking data analytics, these similarities render the two companies direct competitors.

Turning to the next factor, the Court cannot conclude, however, that Cacioppo's new and old roles are "nearly identical." *Papermaster*, 2008 WL 4974508, at *7 (citation omitted). As a sales director at Vortexa, Cacioppo was "responsible for going out and developing new relationships with new customers." Cacioppo Decl. ¶ 36. By contrast, Cacioppo's role at Kpler as Director of Market Engagement consists only of working with a subset of Kpler's existing clients, *id.* ¶ 44 – a "white-glove service" provided to Kpler's top clients, Friedman Reply Decl. ¶ 27. Whereas Vortexa had hired Cacioppo to sell products to newcomers, Kpler hired him to analyze the energy markets and discuss emerging trends with its existing customers. Cacioppo Decl. ¶ 36 ("Rather than hiring me to sell a product, Kpler

was hiring me to talk about the markets with its existing customers."). These differences are reflected in Kpler's organization and Cacioppo's individual incentives: Cacioppo is not part of Kpler's sales team, nor is he "responsible for generating new leads or hosting events." *Id.* ¶ 43. Cacioppo's pay at Vortexa was tied to a sales quota, *id.* ¶ 17, while his compensation at Kpler does not depend on whether Kpler's clients increase their spending, *id.* ¶ 44. Unlike at Vortexa, Cacioppo is no longer responsible at Kpler for "develop[ing] new relationships . . . , generating qualified sales opportunities and moving sales leads through the sales pipeline, and researching new markets and client segments." PI Br. at 2. To the extent that Cacioppo's roles share some similarities – he will continue to educate customers about his company's offerings – this "small overlap" does not render the positions nearly identical. *Visentin*, 2011 WL 672025, at *18. Because Cacioppo does not hold a substantially similar position at Kpler, the Court is not persuaded that a situation will arise in which he would be forced to rely on Vortexa's confidential information.

Vortexa argues that Cacioppo's new job is not "entirely different" because he is charged with "building and maintaining [his company's] relationships with its existing clients," a task that was among his responsibilities at Vortexa. PI Reply at 15. Yet Vortexa mischaracterizes the inevitable-disclosure standard, which requires Cacioppo's new and old positions to be "nearly identical" such that Cacioppo "could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer." *Papermaster*, 2008 WL 4974508, at *7 (citation omitted). The "nearly identical" test is stricter than a "not entirely different" standard that Vortexa suggests. *See* PI Br. at 10 ("Cacioppo has not accepted an entirely different role at Kpler such that the extensive confidential information learned by him could never be used."). Cacioppo does not need any of Vortexa's alleged confidential information to do his job. The bulk of his new job consists

of energy-market analysis, which does not require Vortexa's confidential information, including its competitive positioning, customer data, strategic plans and sales pipelines, or its deal structure.  *See Visentin*, 2011 WL 672025, at *19 (defendant's jobs not "nearly identical" where new job "requires general management skills requiring no confidential information"). That Cacioppo "now has the *opportunity* to utilize" Vortexa's confidential information "to cement Kpler's hold on twenty-eight of its largest clients" is not enough to deem disclosure inevitable because the test is whether disclosure is inevitable, not whether an opportunity or possibility of disclosure exists.  PI Reply at 16 (emphasis added).

Vortexa's cases on this point are also unavailing.  PI Br. at 10-11 (citing *Estee Lauder Cos. v. Batra*, 430 F. Supp. 2d 158, 163 (S.D.N.Y. 2006); *De Freitas Lima*, 2020 WL 5261336, at *13; *Ferreira*, 530 F. Supp. 2d at 482).  Each case involves an employee working in substantially the same role for a competitor.  *See Estee Lauder*, 430 F. Supp. 2d at 176 (involving a marketing strategist responsible for developing brand strategies behind a line of skin care products who sought to assume a position as a marketing strategist for a competitor that also sold skin care products); *De Freitas Lima*, 2020 WL 5261336, at *12 (nearly identical roles where defendant had same goals, reporting structure, and responsibilities); *Ferreira*, 530 F. Supp. 2d at 482 (parties do not dispute that plaintiff's "employment at [competitor] will be in a similar capacity").  Most of the cases also feature acknowledgements, absent here, that a violation of the noncompete covenant would cause the plaintiff employer irreparable harm.  *Estee Lauder*, 430 F. Supp. 2d at 174; *De Freitas Lima*, 2020 WL 5261336, at *14.  For all of these reasons, the second factor weighs against Vortexa.

The third and fourth inevitable-disclosure factors also cut against Vortexa because, for the reasons discussed above, much of the confidential information at issue is either not confidential or is of a general nature that likely is "either generally known in the industry or

easy to duplicate." *Trautman*, 2021 WL 6619331, at *14.  Nothing in the record suggests that Cacioppo possesses any Vortexa documents, and, as previously discussed, Cacioppo's new job will not require him to make sales or otherwise engage with Vortexa's clients.  Under these facts, Vortexa has not demonstrated how any confidential information that Cacioppo retains will be of value to Kpler.  *See Visentin*, 2011 WL 672025, at *20 (lack of defendant's continued access to confidential information and relevance to defendant's new job undercut value of purported trade secrets to plaintiff's competitor).  The Court also finds little evidence in the record as to the nature of the industry and its trade secrets.  Therefore, although Vortexa and Kpler are direct competitors, Vortexa has not shown a risk of irreparable harm through the inevitable-disclosure doctrine because the other factors weigh in favor of Cacioppo.

### 2.  There Is No Other Risk of Irreparable Harm from the Disclosure of Confidential Information

Vortexa also argues that there is a risk of Cacioppo disclosing its confidential information in the future even if his new job would not put him in a position where he would *inevitably* have to use those secrets.  *See* PI Reply at 14.  True, "[a] plaintiff need not necessarily satisfy each of the elements of the doctrine of inevitable disclosure of trade secrets to establish a likelihood of irreparable harm from disclosure of trade secrets or confidential information."  *Trautman*, 2021 WL 6619331, at *14.  In addition, "[i]t is not the case that irreparable harm can flow only from the threat of disclosure of trade secrets; it can also flow from the threat of disclosure of confidential information not rising to the level of a trade secret."  *Id.* at *15; *see id.* ("[T]he category of 'confidential information' is broader than trade secrets."); *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 499 (S.D.N.Y. 2019) ("The disclosure of private, confidential information is the quintessential type of irreparable harm that cannot be compensated or undone by money damages." (quotation marks and citation

omitted)).  "However, the mere exposure of an employee to the trade secrets or confidential information of a former employer does not, without more, create a threat of irreparable harm." *Trautman*, 2021 WL 6619331, at *15.  "The operative question is whether there is a risk that such information will be used or disclosed in a way to cause harm."  *Id.*

Vortexa posits two additional bases to suggest that Cacioppo is at risk of disclosing its confidential information.  First, Vortexa argues that Kpler wants Vortexa's confidential information and hired Cacioppo only for his knowledge of that information, noting that Cacioppo had "zero experience" in the energy-analytics industry before joining Vortexa and has "no knowledge of the products offered by Kpler or Vortexa" other than what he learned through Vortexa.  PI Br. at 11; PI Reply at 17.  The Court is not persuaded.

In his new role, Cacioppo "will talk about markets and what makes market data relevant to end users of Kpler's product."  Friedman Reply Decl. ¶ 22.  The role demands fluency in the financial markets and commodities industry, not technical know-how about energy-analytics software.  On that basis, the Court credits Kpler's testimony that it hired Cacioppo because of his "20 years of experience working on Wall Street and his experience working as a commodities broker."  *Id.* ¶ 23.  Vortexa counters that Cacioppo could not have been hired for his "general experience and familiarity with the commodities market" because Kpler needed "someone who could 'provide relevant, timely insights about market data *in relation to Kpler's products*.'"  PI Reply at 17 (brackets omitted) (quoting Friedman Decl. ¶ 16).  Yet this argument, again, overstates the extent to which Cacioppo will need to interact with the analytics software to do his job.  What matters is whether Cacioppo is at risk of disclosing Vortexa's confidential information in his new role.  Vortexa cannot infer such risk merely because Cacioppo got his start in the data-analytics industry at a different company, especially when he no longer works in sales and Kpler's products are not identical to

Vortexa's.  *See Flatiron Health, Inc. v. Carson*, 2020 WL 1320867, at *15 (S.D.N.Y. Mar. 20, 2020) (defendant's new role "will not require him to draw upon" confidential information of his former employer in part because he "will be drawing largely upon the research skills and medical knowledge he developed in pursuit of his Ph.D. and as a practicing physician").

Second, Vortexa asserts that Cacioppo left the company under suspect circumstances, emphasizing the fact that Cacioppo viewed the Battle Card and the Brochure weeks before he resigned.  *See* PI Br. at 12; PI Reply at 12-13.  But merely viewing a work document, while Cacioppo worked at Vortexa, does not establish an ulterior motive.  The case on which Vortexa relies, *Intertek Testing Servs., N.A. v. Pennisi*, 443 F. Supp. 3d 303 (E.D.N.Y. 2020), features evidence that the defendants erased information from their laptops before returning them and that one defendant emailed the plaintiff's confidential information from his work email address to his personal email.  *Id.* at 333.  By contrast, when Cacioppo resigned from Vortexa, he avoided accessing his former employer's confidential information by, for example, declining a request to log into Vortexa's Salesforce system after he resigned.  Cacioppo Decl. ¶ 41.  "This is not a case where, for example, a defendant has downloaded documents (or retained documents at home) that could only have been – or even appear to have been – downloaded for their competitive value to the new employer."  *Trautman*, 2021 WL 6619331, at *15.  That Cacioppo viewed two documents weeks before his resignation, without more, is not proof of bad faith.  *See EarthWeb II*, 2000 WL 1093320, at *2 (no irreparable harm where plaintiff failed to show that defendant had removed proprietary documents or information or was about to violate his duties under the agreement).  Nor were Cacioppo's assurances to Kedros that he would not be working in sales.  Kedros Decl. ¶ 26.  At no point during this encounter did Cacioppo lie or deny that he was heading to Kpler.  *See id.*  Vortexa's assumption that Cacioppo was "return[ing] to his former profession as a

securities broker" was a mistaken assumption by Kedros and unsupported by Cacioppo's statements.  *Id.*  These interactions therefore do not support a finding that there is likely to be irreparable harm absent an injunction. [6]

## B. Loss of Customer Goodwill

Vortexa also argues that Cacioppo's work at Kpler threatens its goodwill with its clients.  *See* PI Br. at 12-14; PI Reply at 18-19.  True, "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come."  *JTH Tax*, 62 F.4th at 673 (quoting *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999)); *see TomGal LLC v. Castano*, No. 22-cv-09516 (JGK), 2022 WL 17822717, at *5 (S.D.N.Y. Dec. 19, 2022) ("[T]he loss of client relationships and customer goodwill that results from the breach of a non-compete clause generally constitutes irreparable harm." (citation omitted)).  However, Vortexa does not claim that it has lost clients or suffered diminished goodwill because of Cacioppo's actions.  To the contrary, Cacioppo poses no threat to Vortexa's clients because he is working only with Kpler's existing clients, none of which were Vortexa's clients, and is not working in sales to obtain new clients.  Cacioppo Decl. ¶ 44.  Vortexa suggests only that Cacioppo can use its confidential information to insulate Kpler's clients from poaching by

---

[6] The evidence that Cacioppo violated the Agreement by not informing Vortexa of his new employment at Kpler "at least three . . . business days prior to starting" his new job is concerning.  Agreement § 8(A).  "There is a risk that a person who knowingly violates her legal or contractual duties in the past will do so in the future."  *Trautman*, 2021 WL 6619331, at *16.  However, "not every past contractual violation (if there were any) is sufficient to demonstrate that an employee will violate its obligations to the former employer not to disclose its confidential information."  *Id.* at *15.  The record does not reveal why Cacioppo did not give notice of his new employment in February 2024.  Cacioppo may not have been aware of this requirement, but even if he was, there is no evidence before the Court that he delayed giving notice for the purpose of sharing confidential information with Kpler.  *See id.* at *15-16 (no risk of irreparable harm despite evidence that the defendant violated requirement in her employment agreement that she provide notice of an accepted job offer).

Vortexa.  *See* PI Reply at 14-15 ("Cacioppo will be able to draw on his knowledge of Vortexa
confidential information to lay the groundwork for a smooth [contract] renewal and ensure the
client is not susceptible to any attempt by Vortexa to engage them when the renewal is up.");
*id.* at 16 ("Cacioppo . . . knows exactly how to address Kpler's weaknesses . . . and play up
Vortexa's perceived weaknesses to head off any challenge to Kpler's relationship with his
clients.").  This claim fails because it speaks only to the likelihood that Vortexa cannot secure
new business, not the likelihood that it will lose an existing customer.  In any event, it is far
too speculative as to the possibility of future harm.  *See Faiveley*, 559 F.3d at 118 (plaintiff
must allege "an injury that is neither remote nor speculative, but actual and imminent" to
support a showing of irreparable harm); *cf. Coiteux*, 2017 WL 4339486, at *3 (no irreparable
harm where plaintiff has offered no evidence of "customers that [the defendant] has
approached, much less any business that he has taken from [the plaintiff] or client
relationships that he has compromised").

The absence of evidence as to Cacioppo's solicitation of Vortexa's clients also
distinguishes this case from those on which Vortexa relies.  *See Intertek*, 443 F. Supp. 3d at
330 (defendant solicited customer's business for competitor while still employed by former
employer); *Devos, Ltd. v. Record*, No. 15-cv-06916 (ADS), 2015 WL 9593616, at *9
(E.D.N.Y. Dec. 24, 2015) (no dispute that individual defendants are soliciting business from
customers of plaintiff); *Uni-World Cap.*, 73 F. Supp. 3d at 223, 232 (defendant assisted
plaintiff's competitor with sales in violation of noncompete agreement on multiple occasions);
*Singas Famous Pizza Brands Corp. v. N.Y. Advert.*, 468 F. App'x 43, 47 (2d Cir. 2012)
(summary order) (defendant restaurant used a "virtually identical" menu as plaintiff, "adopted
certain distinctive practices" associated with plaintiff's restaurants, "employed at least some
of the same personnel," and "used certain custom-made equipment" from one of plaintiff's

closed restaurants).  Therefore, the Court is not convinced that Vortexa is likely to suffer irreparable harm to its customer goodwill without an injunction.

*          *          *

For all these reasons, the Court finds that Vortexa has not established a likelihood of irreparable harm, necessary for the imposition of an injunction barring his employment from Kpler.  Because Vortexa has failed to establish that it is likely to suffer irreparable harm, the Court need not reach the issue of likelihood of success on the merits of the case that is proceeding through arbitration or the remaining preliminary-injunction factors.  *See Trautman*, 2021 WL 6619331, at *18 (taking the same approach after finding no irreparable harm).

However, Cacioppo has stated that he "is willing to agree to an order enjoining him from disclosing any of Vortexa's confidential information until this dispute can be addressed in arbitration."  MTD Reply at 20.  To further decrease the risk of irreparable harm and to protect the status quo, the Court will enter this undisputed order.

### III.  Expedited Discovery

Finally, the Court turns to Vortexa's request for expedited discovery.  Vortexa seeks documents and testimony from Cacioppo and Kpler to "uncover whether Cacioppo retained Vortexa confidential information, the precise nature of Cacioppo's work with Kpler's client, the level of interaction between Cacioppo and the commercial and product teams at Kpler, and the substantial overlap between Vortexa products and the products that Cacioppo is working on at Kpler."  PI Reply at 25.

"When determining whether to grant expedited discovery, courts in this District apply a flexible standard of reasonableness and good cause."  *SingularDTV GmbH v. LeBeau*, No. 21-cv-10130 (VEC), 2022 WL 1082557, at *1 (S.D.N.Y. Apr. 6, 2022) (quotation marks

and citation omitted).  This test "requires a district court to examine the request on the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances." *In re Keurig Green Mountain Single-serve Coffee Antitrust Litig.*, No. 14-cv-04242 (VSB), 2014 WL 12959675, at *1 (S.D.N.Y. July 23, 2014) (quotation marks, emphasis, and citation omitted).

Having already ruled on Vortexa's preliminary-injunction motion, the Court finds expedited discovery unwarranted.  In the two cases cited by Vortexa, the court considered requests for expedited discovery submitted in advance of a preliminary-injunction hearing or the court's ruling on the request for injunctive relief.  *See* PI Br. at 16 (citing *In re Keurig*, 2014 WL 12959675, at *2; and *Russell Reynolds Assocs., Inc. v. Usina*, No. 23-cv-02369 (JHR), 2023 WL 3270344, at *1 (S.D.N.Y. May 5, 2023)).  Here, however, Vortexa conditions its request on losing its preliminary-injunction motion, seeking expedited discovery only if the Court determines that Vortexa has not offered enough evidence.  PI Reply at 25.  As Vortexa stated, it believed that the information attached to its motion was sufficient even without expedited discovery.  *See* PI Br. at 15.  Vortexa further declined an evidentiary hearing and oral argument, opting instead to rely on the evidence submitted by the parties with their briefs.  Therefore, the potential prejudice that could result from denying the request is limited.  *See Citigroup Inc. v. AT&T Inc.*, No. 16-cv-04333 (KBF), 2016 WL 8794472, at *1 (S.D.N.Y. July 1, 2016) (denying motion for expedited discovery where plaintiff has already moved for a preliminary injunction and "believes that the information it has attached to its motion is adequate to prevail").  The Court will not grant Vortexa a second bite at the preliminary-injunction apple where it has already considered a robust body of arguments and evidence submitted in connection with the motion, including multiple supporting affidavits from Cacioppo and his manager at Kpler.  Moreover, Cacioppo initiated

32

arbitration several months ago, on March 29, 2024, *see* Cacioppo Arb. Cl.; discovery in that forum will provide Vortexa, in short order, with all of the documents and testimony it desires.

## CONCLUSION

For the foregoing reasons, Cacioppo's motion to dismiss the complaint and compel arbitration is DENIED.  Vortexa's request for a preliminary injunction is DENIED except insofar as Cacioppo is preliminarily enjoined from disclosing any of Vortexa's confidential information until this dispute can be addressed in arbitration.

Given that the parties are jointly proceeding with arbitration, this case shall be stayed pending the arbitration.  The parties shall file a joint letter updating the Court regarding next steps within 10 days of the conclusion of the arbitration.  The initial pre-trial conference scheduled for June 26, 2024 is adjourned.

Dated: June 12, 2024
       New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge